Filed 12/17/19 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DORIAN L. JACKSON,<br><br>    Cross-complainant and Appellant,<br><br>v.<br><br>LEGALMATCH.COM,<br><br>    Cross-defendant and Respondent. | A152442<br><br>(San Francisco City & County<br><br>Super. Ct. No. CGC-15-547260)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion herein filed on November 26, 2019, be modified as follows:

On page 11, the last sentence of the second full paragraph, beginning, "Solicitation 'robs the bar of . . . .' " is changed to:

"Solicitation 'robs the bar of dignity. . . [and] creates an atmosphere of commercialization rather than professionalism.' "

There is no change in the judgment.

Respondent's petition for rehearing is denied.

Dated:_____          _____, Acting P.J.

1

Filed 11/26/19 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| DORIAN L. JACKSON,<br><br>        Cross-complainant and Appellant,<br><br>v.<br><br>LEGALMATCH.COM,<br><br>        Cross-defendant and Respondent. | A152442<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-15-547260) |

**OVERVIEW**

LegalMatch.com (LegalMatch) is an online service company that connects individuals seeking legal assistance to lawyers who have purchased a LegalMatch subscription. LegalMatch sued Dorian Jackson, a lawyer, when he allegedly failed to pay for his LegalMatch subscription. Jackson cross-claimed on the basis that LegalMatch is operating an uncertified lawyer referral service in violation of Business and Professions Code[1] section 6155, rendering the subscription contract illegal and unenforceable. After a bench trial, the court rejected Jackson's argument, finding that LegalMatch does not engage in referral activity within the meaning of section 6155. We disagree and therefore reverse and remand.

---

[1] All further statutory references are to the Business and Professions Code unless otherwise specified.

# BACKGROUND

**I.**    **LegalMatch's Services**

LegalMatch operates an online website, www.legalmatch.com, that connects individuals to lawyers. Individuals who utilize the service are invited to fill out an intake form with information about their legal issue. Users must select their specific geographic location and the legal category that relates to their issue, such as business litigation, family law, criminal defense, or intellectual property. Depending on the legal category selected, LegalMatch requests additional information from potential clients about issues "prospective attorneys would like to hear." However, responding to the requests for additional information is not mandatory, and the potential clients' answers can be "gibberish." Potential clients may also write a "summary of [their] case," but they are not required to do so. LegalMatch's website represents that this process is designed to mimic a "lawyer . . . during an initial consultation." Finally, individuals may require a lawyer with a minimum number of years of experience and designate a preferred method of payment.

Potential clients are required to accept LegalMatch's terms and conditions before the intake process is completed. In its terms and conditions, LegalMatch represents that it "does not screen or vouch for any of its users." Additionally, LegalMatch includes a disclaimer that it "[p]rovid[es] a service where potential clients and legal professionals can meet. [It d]oes not imply an endorsement of any subscribing attorney or service provider. LegalMatch makes no representation concerning an attorney's qualifications, except the attorney was licensed to practice in at least one state at the time of registration nor does it sanction statements that an attorney may post on the system. LegalMatch makes no representations concerning the qualifications of non-attorney legal service providers. [A client's] case will not be reviewed by non-attorney legal service providers by consent. LegalMatch does not screen individual cases or otherwise channel potential clients to select attorneys."

Once individuals have completed the intake process and accepted the terms and conditions, LegalMatch communicates the information collected during the intake

process to lawyers who have subscribed to LegalMatch's service. Only subscribing lawyers associated with the geographic location and legal category selected by the potential client receive the information. LegalMatch sends information to lawyers based solely on the client's selection of geographic location and area of expertise. After the lawyers receive this information, each lawyer has the opportunity to affirmatively reach out to the individual. The lawyer must first utilize LegalMatch's platform to initiate contact with the potential client. Depending on the client's preferences, the potential client may choose to send contact information to the lawyer so that they may continue their discussion outside of the platform. Lawyers and clients negotiate between themselves to determine the parameters of their attorney-client relationship.

LegalMatch's business model relies on yearly or multi-year subscriptions that lawyers may purchase to receive LegalMatch's intake information. Each lawyer who purchases a subscription is slotted into a geographic location and category of legal expertise. The number of lawyers in a geographic location and category of legal expertise is limited by an algorithm (allocation system) that maintains LegalMatch's profitability by balancing the number of clients and lawyers available. For example, LegalMatch placed Jackson on a waiting list before he was accepted to the panel of subscribing lawyers for the category of wills, trusts, and estates.

Potential clients may use the site for free, and LegalMatch receives no fee for the successful formation of an attorney-client relationship.

## II.     Procedural History

Dorian Jackson purchased a subscription with LegalMatch, initially in the field of business litigation and then, after he was accepted, in the category of wills, trusts, and estates. When LegalMatch sued Jackson to recover unpaid subscription fees, Jackson

cross-claimed, asserting that LegalMatch was an uncertified lawyer referral service that was operating in violation of section 6155.[2]

The parties attempted to resolve the issue of whether LegalMatch operated as a lawyer referral service through cross-motions for summary adjudication. Because the trial court was unable to decide the issues on summary adjudication, the parties proceeded to a bench trial to present evidence on the issue of whether LegalMatch's system constituted a lawyer referral service.

After hearing evidence, the trial court issued a statement of decision in which it found that LegalMatch was not a lawyer referral service governed by section 6155. The court and parties agreed that determining whether LegalMatch operated a lawyer referral service depended on the resolution of two questions, apparently gleaned from the language of section 6155: "Does LegalMatch.com engage in referral activity? If so, does it operate for the direct or indirect purpose of engaging in referral activity?" The court found that "[t]he answer to both questions is 'no.' " In reaching this conclusion, the trial court reasoned that LegalMatch "[did] not in fact exercise any judgment on any legal issue . . . [and did] not evaluate the consumer's input in order to generate a conclusion that a legal issue [was] presented."

This appeal followed.

---

[2] Section 6155 regulates entities that refer potential clients to attorneys. In relevant part, section 6155, subdivision (a)(1) provides that "[a]n individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients," unless "[t]he service is registered with the State Bar of California and . . . is operated in conformity with minimum standards for a lawyer referral service established by the State Bar" or "is operated in conformity with" standards set by the Supreme Court. Subdivision (h)(1) provides that "[p]ermissible joint advertising, among other things, identifies by name the advertising attorneys or law firms whom the consumer of legal services may select and initiate contact with," while subdivision (h)(2) states that "[c]ertifiable referral activity involves, among other things, some person or entity other than the consumer and advertising attorney or law firms which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified in the advertising." (§ 6155, subd. (h).)

4

# DISCUSSION

Jackson asserts that the trial court erred when it found that LegalMatch did not engage in referral activity because it did not exercise judgment on a client's legal issues. Based on our interpretation of the statute and the plain meaning of the term "referral," we agree. Under section 6155, it does not matter whether LegalMatch exercises judgment on an individual's legal issues before communicating that information to a lawyer. Rather, a referral occurs when an entity directs or sends a potential client to an attorney.

## I.     Standard of Review

While reviewing a judgment based upon a statement of decision following a bench trial, the appellate court reviews the trial court's findings of fact under a substantial evidence standard. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) In applying the substantial evidence standard, an appellate court defers to a trial court's findings of fact by "liberally constru[ing] [them] to support the judgment." (*Ibid.*) The court considers the evidence in the light most favorable to the prevailing party and draws all reasonable inferences in support of the findings. (*Ibid.*) However, questions of law— such as the interpretation of a statute—are reviewed de novo. (*Ibid.*; see *Smith v. Superior Court* (2006) 39 Cal.4th 77, 82–83.) Jackson does not dispute the trial court's factual findings regarding LegalMatch's operations. Instead, he argues that he is entitled to reversal under a de novo interpretation of section 6155 in light of the undisputed facts. We agree and review the trial court's interpretation of section 6155 de novo. (See *Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385, 1407 [applying de novo review to questions of statutory interpretation arising from a judgment based on a statement of decision].)

## II.     Governing Legal Principles

In interpreting a statute, this court's "fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose." (*Meza v. Portfolio Recovery Associates, LLC* (2019) 6 Cal.5th 844, 856 (*Meza*).) The court first examines the statutory text, giving it a "plain and commonsense" meaning. (*Ibid.*) If the language is clear, the court must follow the text's plain and commonsense meaning unless a literal

5

interpretation would result in absurd consequences the Legislature did not intend.  (*Ibid.*; *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616.)  The plain and commonsense meaning governs "unless the statute specifically defines the words to give them a special meaning."  (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082–1083 (*MacIsaac*).)  The statutory language is not examined in isolation but is reviewed in the context of the statutory framework while giving effect to the apparent purpose of the statute.  (*Ibid.*; *Meza*, at pp. 856–857.)  If the statutory language is ambiguous and allows for more than one reasonable interpretation, we turn to maxims of construction and the legislative history to inform our interpretation of the statute.  (*Meza*, at p. 856; *MacIsaac,* at pp. 1082–1083.)

## III.    Analysis

### A.  Waiver

LegalMatch argues that Jackson has waived his statutory construction argument because the parties purportedly agreed in the trial court to apply a "litmus test" from the American Bar Association (ABA) that "would determine whether LegalMatch had engaged in referral activity under [s]ection 6155."  LegalMatch further contends that Jackson is barred from "rais[ing] new theories" on appeal because he argued below that section 6155 was not ambiguous.  We disagree.

" 'As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.' "  (*Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 621.)  But "[w]hether "the rule is to be applied is largely a question of an appellate court's discretion."  (*Parker v. Tract No. 7260 Assn., Inc.* (2017) 10 Cal.App.5th 24, 36, rehg. den. Apr. 13, 2017, review den. July 12, 2017.)

LegalMatch asserts that the parties agreed to a controlling meaning of "referral" at trial.  Specifically, LegalMatch claims that the parties agreed that construction of the term

6

"referral" would be controlled by a purported "litmus test"[3] from the ABA's Standing Committee on Lawyer Referral and Information Service's Model Supreme Court Rules Governing Lawyer Referral and Information Services (ABA Model Rules). The introduction to the ABA Model Rules states: "Lawyer referral programs offer two important services to the public. First, they help the client determine if a problem is truly of a legal nature by screening inquiries, and referring the client to other service agencies when appropriate. The second and perhaps more important function of a lawyer referral service is to provide the client with an unbiased referral to an attorney who has experience in the area of law appropriate to the client's needs."

Jackson never agreed in the trial court that the ABA Model Rules provide the controlling definition. Instead, as on appeal, Jackson relied principally on the plain meaning of the term "referral" to argue that LegalMatch engages in referral activity within the meaning of section 6155. Although Jackson did cite the ABA Model Rules in his trial brief, he did so only to note that the analysis required by the plain meaning of section 6155 is "consistent" with the ABA Model Rules. Jackson thus never agreed to the ABA Model Rules as the sole and proper definition of "referral."

LegalMatch is also mistaken in contending that Jackson has changed his position on appeal. Jackson's arguments on appeal remain consistent with the arguments he advanced in his pre- and post-trial briefs. Both here and below, Jackson cites largely the same dictionary definitions to support his argument that "referral" has a plain and commonsense meaning. Jackson's failure to discuss the statutory framework and legislative history in his trial brief does not waive these arguments on appeal, as we review de novo the question of statutory interpretation and Jackson's primary argument remains that the term "referral" is unambiguous. As noted above, under well-established rules of statutory interpretation, a statute's "plain and commonsense meaning" will end the inquiry into how to interpret the term. (*Meza*, *supra*, 6 Cal.5th at p. 856.) Should we decide that the term "referral" is indeed ambiguous, we would then "consider other aids,

_____

[3] The term "litmus test" is not used by the American Bar Association. It appears to be a term coined by the parties in this case.

7

such as the statute's purpose, legislative history, and public policy." (*Ibid.*) Jackson's citations to legislative history on appeal merely follow this analytical framework.

In sum, we conclude that Jackson did not waive any of his arguments on appeal.

### B. *The Plain and Commonsense Meaning of "Referral"*

We read the statutory text to give a "plain and commonsense" meaning to the term "referral." (*Meza*, *supra*, 6 Cal.5th at p. 856.) As used in the statute, the terms "refer" and "referral" focus on the *act* that an individual or entity commits in sending potential clients to an attorney.

Preliminarily, we note that there is a paucity of case law interpreting section 6155. The only arguably pertinent authority is *Hyon v. Selten* (2007) 152 Cal.App.4th 463 (*Selten*), which both parties cite. *Selten,* however, is not particularly helpful to our analysis, notwithstanding LegalMatch's assertion that *Selten* clearly states that the term "referral" is unambiguous. *Selten* involved a contract in which Hyon and Colangelo agreed to pay Selten's company "to retain counsel" for Hyon and Colangelo and to provide other litigation services. (*Id.* at p. 465.) The contract expressly provided that Selten's company would not be paid if it was " 'unsuccessful in arranging' " for counsel for Hyon and Colangelo. (*Ibid.*) Without explanation, the *Selten* court found "as a matter of law, that, under the contract, Hyon and Colangelo were paying [Selten's company], in part, to refer them to an attorney," and held that the contract "violated section 6155" because it "called for [Selten's company] to 'operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys.' " (*Id.* at p. 468.)

In the course of so holding, the court rejected Selten's reliance on legislative history materials that related to an earlier version of section 6155, noting: "[E]ven if we found the statutory language sufficiently ambiguous to require resort to legislative history—which we do not—the materials cited by Selten would have no effect on our decision, because they relate to a version of the statute that did not include the language on which we rely." (*Id.* at p. 470.) When it rejected Selten's assertion that the statute was ambiguous, the court was referring to the phrase "operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys"— not the term

8

"referral," which *Selten* did not meaningfully interpret. (*Id*. at pp. 468–470.) Accordingly, *Selten* does not illuminate the meaning of that term, and we have found no other authority that does.

We thus conduct our own analysis of the statutory text. The word "referral" and its cognates appear multiple times in section 6155. First, the statute provides that an individual or entity "shall not operate for the direct or indirect purpose, in whole or in part, of *referring* potential clients to attorneys, and no attorney shall accept a *referral* of such potential clients" unless the referring individual or entity is registered and meets certain standards (§ 6155, subd. (a)(1), italics added.) Second, an individual or entity that does refer potential clients to attorneys must be "operated in conformity with minimum standards for a lawyer *referral* service established by the State Bar or Supreme Court." (*Ibid*., italics added.) Third, "[c]ertifiable *referral* activity involves, among other things, some person or entity other than the consumer and advertising attorney or law firms which, in person, electronically, or otherwise *refers* the consumer to an attorney or law firm not identified in the advertising." (§ 6155, subd. (h)(2), italics added.)[4]

Section 6155 provides no definition of "referring" or "referral." Instead, the statutory text appears to focus on the *act* of connecting potential clients with attorneys, with the additional requirement that the covered individual or entity operate for the direct or indirect purpose of doing so. (§ 6155, subd. (a).) Read in the context of the statute, the plain meaning of the term "referral" means no more than the "act or an instance of sending or directing to another for information, service, consideration, or decision." (Black's Law Dict. (11th ed. Westlaw 2019).) Other dictionary definitions support this interpretation. For example, Webster's New Collegiate Dictionary defines "refer," as relevant here, as to "send or direct for treatment, aid, information, or decision." (Webster's 9th New Collegiate Dict. (1987) p. 989.) Even LegalMatch's cited definition—"to send to another for business or another matter, e.g., to refer a client to

---

[4] The "advertising" mentioned in section 6155, subdivision (h)(2) refers to "[p]ermissible joint advertising" as described in section 6155, subdivision (h)(1). (See fn. 2 *ante*.)

9

another attorney"—focuses on the act of directing the client to the attorney and contains no requirement that the referring party make an initial judgment regarding the client's circumstances.  (*Refer*, TheLaw.com Dictionary <https://dictionary.thelaw.com/refer/> [as of November 26, 2019].)

Nowhere does the Legislature provide a special meaning for "referral" or suggest that it is a term of art.  As we must rely on a statute's " 'plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning," (*MacIsaac*, *supra*, 134 Cal.App.4th at p. 1083), we decline to read into the term "referral" a specialized meaning involving screening or the exercise of judgment before sending a potential client to a lawyer.

Nor does the phrase "lawyer referral service" in section 6155, subdivision (a)(1) create a specialized meaning of the term "refer" or "referral."  Although the Legislature required a "lawyer referral service" to satisfy certain minimum standards, requiring compliance with such standards does not resolve the question of what a referral is in the first instance.  (See § 6155, subd. (a).)  The standards in section 6155, subdivision (a)(1) simply set forth requirements that an entity must follow once it has already decided or been found to engage in referral activity.

## C.  *The Overall Statutory Scheme*

Our plain and commonsense reading of the term "referral" is confirmed by analysis of the statutory framework to ascertain section 6155's purpose.  The Legislature enacted section 6155 within a broader framework regulating unlawful solicitation. (§ 6150 et seq.)  It had previously enacted the surrounding provisions to reduce "ambulance chasing" activities.  (*Hutchins v. Municipal Court* (1976) 61 Cal.App.3d 77, 85.)  "Ambulance chasers"—such as lawyers, insurance agents, claims agents, or their agents—would often visit "homes and hospitals to procure retainers at unseemly hours, and when the injured person or the members of his family were in no mental condition to enter into contracts for the engagement of lawyers' services."  (*Hildebrand v. State Bar of Cal.* (1950) 36 Cal.2d 504, 523 (dis. opn. of Traynor, J.).)  Third-party ambulance chasers who solicited cases and sold them to lawyers were apt "to seek out, not the most

10

competent attorney, but the one who [would] pay the most for a case." (*Ibid*.) "Ambulance chasers" often did not have the best interests of the clients at heart and would use "overreaching and high-pressure tactics to acquire clients." (*Jacoby v. State Bar* (1977) 19 Cal.3d 359, 379 (*Jacoby*) [noting that such conduct was not at issue].)

The Legislature thus enacted broadly-worded statutes to bar any person from acting as a runner or capper for an attorney or soliciting business for attorneys "in and about the state prisons, county jails, city jails, city prisons, or other places of detention of persons, city receiving hospitals, city and county receiving hospitals, county hospitals, superior courts, or in any public institution or in any public place or upon any public street or highway or in and about private hospitals, sanitariums or in and about any private institution or upon private property of any character whatsoever." (§ 6152, subd. (a)(1).) A runner or capper is defined as any person who "solicit[s] or procure[s] . . . business for the attorney" while acting for "consideration in any manner" or as an "agent for an attorney." (§ 6151, subd. (a).)

Our Supreme Court has recognized that the statutory regulation of solicitation satisfies important interests relating to consumer protection and attorney professionalism. (See *Kitsis v. State Bar* (1979) 23 Cal.3d 857, 864, 867 (*Kitsis*); *Jacoby, supra*, 19 Cal.3d at pp. 379–380.) In reference to state disciplinary rules regarding runners and cappers, the Supreme Court stated that the "state has a compelling interest . . . to 'reduce the likelihood of overreaching and the exertion of undue influence . . . and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest.' " (*Kitsis,* at p. 864.) Solicitation "robs the bar of . . . [and] creates an atmosphere of commercialization rather than professionalism." (*Jacoby*, at p. 379.)

Section 6155 provides an important exception to this overarching statutory framework and legislative concern regarding unscrupulous solicitation. As the Legislature stated in the bill first enacting section 6155, citizens often "[found] it difficult to locate attorneys willing to consult with them." (Assem. Bill No. 29 (1987–1988 Reg. Sess.) § 1.) Lawyer referral services could alleviate this problem, but a "potential for

11

abuse exists." (*Ibid.*) Attorneys might be tempted to engage in activities akin to "ambulance chasing" or employ runners or cappers to solicit clients. (*Ibid.*; see also *Kitsis*, *supra*, 23 Cal.3d at pp. 861–862, 864.) To balance these competing interests—the need for the public to seek out legal representation and to protect against unprincipled activities that would abuse clients—the Legislature decided that "lawyer referral services are of great value . . . [and] should be regulated in order to ensure that those services exist for the true benefit of the public." (Stats. 1987, ch. 727, § 1.)

Viewed in this context, the statutory framework surrounding section 6155 supports our interpretation of a referral as the *act* of directing a potential client to an attorney. The Legislature has created an exception to the prohibition on client solicitation through runners and cappers by allowing lawyer referral services to operate as long as they are registered with the State Bar and comply with standards set by the State Bar or Supreme Court. (§ 6155, subd. (a).) Requiring lawyer referral services to meet minimum standards ensures that consumers are protected when they engage with entities that operate in a manner similar to runners and cappers. (See Stats. 1987, ch. 727, § 1; see also §§ 6155, subd. (a)(1), 6152, subd. (a)(1).) Broadly interpreting referral activity to focus on the act of directing a potential client to an attorney is consistent with the overarching statutory scheme that generally prohibits client solicitation for consideration or on behalf of an attorney, except when done in a manner that is regulated and compliant with state standards. (§§ 6152, subd. (a)(1), 6155, subd. (a)(1).) Defining "referral" to cover only an entity that exercises judgment or evaluates a case before directing a potential client to an attorney unnecessarily narrows the reach of section 6155 and thereby undermines the statutory purpose of public protection.

LegalMatch claims that the statutory framework is irrelevant because it "is not a runner or capper." We do not decide whether LegalMatch is either; rather, our review of related statutes is confined to discerning the purpose of section 6155 by analyzing its broader statutory framework.

*D. Section 6155's Legislative History*

Although "referral" has a plain and commonsense meaning that makes our review of the legislative history unnecessary, we briefly examine section 6155's legislative history to confirm that our interpretation is correct. (*Meza*, *supra*, 6 Cal.5th at pp. 856–857.) When the Legislature first enacted the statute in 1987, section 6155 prohibited an entity from marketing itself as a "referral service" unless it was registered with the State Bar of California and followed minimum standards for lawyer referral services. (Stats. 1987, ch. 727, § 2.) However, in both 1992 and 1994, the Legislature amended section 6155 to expand its scope and coverage of entities that engage in referral services. (See Assem. Bill No. 2970 (1991–1992 Reg. Sess.); see also Assem. Bill No. 3659 (1993–1994 Reg. Sess.).)

When originally enacted, the statutory text provided that an "entity shall not use the term 'referral service' or similar terms" if the entity's purpose was "to refer potential clients to attorneys," unless the entity was registered with the State Bar or Supreme Court and met minimum standards. (Stats. 1987, ch. 727, § 2.) The 1992 amendment, however, expanded the statutory focus beyond the question of whether an entity was calling itself a "referral service" or something similar. (Stats. 1992, ch. 150, § 1, subd. (a).) That amendment deleted the language relating to "use" of the term "referral service" and replaced it with language that remains today, providing that an "entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys" unless the entity was registered with the State Bar or Supreme Court and met minimum standards. (*Ibid*.) The amendment thus broadened the statute's focus from mere nomenclature to consideration of the entity's underlying activity and purpose: *whether the entity in fact operated for the purpose of referring clients.* This shift in the statute's application and reach indicates that the Legislature did not intend to allow entities to escape the statute's provisions simply because they did not denominate themselves as "referral services."

The 1994 amendment narrowed the types of activity that were considered permissible advertising, while clarifying what would constitute certifiable referral

13

activity. (See Stats. 1994, ch. 711.) The original 1987 statute simply stated that "[t]his section shall not be construed to prohibit attorneys from jointly advertising their services." (Stats. 1987, ch. 727, § 2, subd. (h).) But this provision left a gap in the statute's coverage by creating an undefined exception to the mandatory registration and minimum standards required for covered entities. (See Stats. 1987, ch. 727, § 2, subds. (a)(1), (h); see also Stats. 1992, ch. 150, § 2, subd. (a)(1).) By engaging in "advertising"—which was undefined by the statute—as opposed to acting for the purpose of referring, an entity could avoid the statute's compliance requirements. The 1994 amendment eliminated this ambiguity by clarifying permissible advertising and certifiable referral activity. (Stats. 1994, ch. 711, § 2, subd. (h)(1), (2).)[5] Specifically, it permitted joint attorney advertising and provided that "permissible joint advertising, among other things, identifies by name the advertising attorneys or law firms whom the consumer of legal services may select and initiate contact with." (Stats. 1994, ch. 711, § 2, subd. (h)(1).) It also added that "[c]ertifiable referral activity, involves, among other things, some person or entity other than the consumer and advertising attorney or law firms which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified in the advertising." (Stats. 1994, ch. 711, § 2, subd. (h)(2).)

While the 1994 Amendment permits joint attorney advertising under narrow circumstances (such as when the advertising attorneys are specifically identified by name and the potential client may initiate contact with them), the Legislature broadly defined certifiable (and therefore, regulated) "referral activity" to cover any entity "which, in person, electronically, or otherwise, refers the consumer to an attorney or law firm not identified" in permissible advertising. (Stats. 1994, ch. 711, § 2, subd. (h)(1), (2).) Under these definitions, LegalMatch engages in certifiable referral activity, not mere advertising. LegalMatch receives information from potential clients and sends that

---

[5] In addition, the 1994 Amendment generally prohibited deceptive attorney advertising and barred certain specific practices, such as guaranteeing outcomes or touting the ability to "obtain immediate cash or quick settlements." (Stats. 1994, ch. 711, §§ 5, 6, amending §§ 6157.2 and 6158.)

information to lawyers. LegalMatch does not advertise the name of the attorneys subscribed to their service to potential clients, and clients do not learn the name of their potential lawyer until after the referral has occurred.

LegalMatch relies on a failed 2007 Assembly Bill to suggest that we should read section 6155 to exclude entities like LegalMatch from the statute's reach. In 2007, the Legislature considered—but did not pass—Assembly Bill No. 692, which would have defined lawyer referral services to include "a service provided through the Internet that operates for the purpose of referring potential clients to California attorneys." (Assem. Bill No. 692 (2007–2008 Reg. Sess.) as amended April 18, 2007.) Because failure to amend an existing statute offers "only limited guidance, if any" about the Legislature's original intent, we "attach little value to the Legislature's subsequent failure to pass a bill. (*Martin v. Szeto* (2004) 32 Cal.4th 445, 451.) Although the court in *Doe v. Becerra* (2018) 20 Cal.App.5th 330, 342 suggested that unpassed legislation could be instructive, the court there relied on unpassed legislative bills that *preceded* the statute, not unpassed legislative bills that *succeeded* the statute's enactment.

In sum, the legislative history supports our interpretation of the statute's plain meaning and broad reach.

### E. The ABA Model Rules

LegalMatch argues that we must determine whether it engages in referral activity within the meaning of section 6155 by reference to a so-called "litmus test" derived from the ABA Model Rules. As previously noted, the introduction to the ABA Model Rules states that lawyer referral programs "help the client determine if the problem is truly of a legal nature by screening inquiries" and "provide the client with an unbiased referral to an attorney" capable of handling the client's needs. Relying on the ABA Model Rules, LegalMatch argues that a lawyer referral program must screen a client's issues prior to directing a client to an attorney. According to LegalMatch, this characterization of lawyer referral programs by the ABA should control our interpretation of section 6155. We disagree.

15

First, when this court engages in statutory interpretation, the statutory text and purpose control. (*Meza*, *supra*, 6 Cal.5th at p. 856.) The ABA's characterization of lawyer referral services, while perhaps illuminating, cannot supersede the plain meaning of the statutory text and the Legislature's intent. (See *Frye v. Tenderloin Housing Clinic, Inc.* (2006) 38 Cal.4th 23, 52, fn. 12 [noting that while ABA Model Rules may be " 'helpful and persuasive' . . . [they] are not binding"].) LegalMatch directs our attention to an Alabama Supreme Court case where the ABA Model Rules were determinative in evaluating whether an advertising agency engaged in referral activity. (*Alabama State Bar Ass'n v. R.W. Lynch Co., Inc.* (1995) 655 So.2d 982, 984.) However, the Alabama court relied on the ABA Model Rules to resolve a question of ethics, not a question of statutory interpretation like the one we face here. (*Ibid.*)

Second, the statutory language at issue precedes the ABA Model Rules' existence. Specifically, the ABA Model Rules were published in 1993, while the relevant statutory language—including the terms "lawyer referral service," "referring," and "referral"—was enacted in 1987 and amended in 1992.[6] (Stats. 1987, ch. 727, § 2; Stats. 1992, ch. 150, § 1.)

We thus decline to read into section 6155 an ABA-derived requirement that an entity must "screen" client inquiries before it will be found to have engaged in referral activity.

### F. Application to LegalMatch's Operations

Based on the undisputed facts found by the trial court and under our interpretation of the statute, LegalMatch does engage in referral activity. As we have held, a referral occurs when an entity engages in the act of directing or sending a potential client to an

---

[6] Although section 6155 was amended in 1994, those changes did not affect the definition of the operative terms. (Stats. 1994, ch. 711.)

attorney.[7]  The act of referring is complete when LegalMatch routes a potential client to attorneys who match the geographic location and area of practice—regardless of whether LegalMatch exercises legal judgment on an individual's issue before communicating that information to lawyers on its panel.

As described above, after potential clients input their information into LegalMatch's online intake forms, LegalMatch sends that information to attorneys associated with the relevant business practice and geographic location that the client has requested.  The *act* of sending the information to the selected lawyers constitutes and completes the referral.  As LegalMatch's key witness explained, "[c]onsumers come to our website, and they present their case, and based on the category of law and the location that they need help in, are automatically sent to prospective attorneys; and if that attorney has access to that area of law and geographic location, then they have an opportunity to respond to the case."  LegalMatch's admission that consumers are "sent to prospective attorneys" is the equivalent of being "directed to" or "referred to" an attorney.[8]

---

[7] LegalMatch seems to argue that it does not "screen cases," "assess attorneys," nor "discriminate or prioritize among the subscribing attorneys."  While LegalMatch does not screen or assess lawyers after they have joined LegalMatch's service, it appears that LegalMatch does engage in some types of screening before lawyers may join its service. Limitations are placed on the number of attorneys that may purchase subscriptions for any particular geographic area and type of law.  Thus, instead of directing clients to all lawyers who share a particular geographic location and expertise, as a phonebook or telephone directory might, clients are directed to a subset of attorneys, namely those who have been permitted to join LegalMatch's panel for that practice area.  For example, Jackson could not immediately join the wills, trust, and estate practice, but rather had to wait until an opening was available.  Moreover, LegalMatch informs consumers that they can "review the experience, expertise, track record, availability, and fee structure, of *pre-screened* lawyers who match [the consumers'] criteria before deciding whom to contact" (italics added), and further states that "[w]e screen all potential LegalMatch lawyers."

[8] LegalMatch's terms of service or disclaimers may limit LegalMatch's exposure vis-à-vis claims by potential clients, but they do not bear on the question of whether LegalMatch's act of sending the potential client to its stable of attorneys falls within the meaning of "referral" and "refer" in section 6155.

The fact that the subscribing lawyer evaluates the case and must affirmatively decide whether to reach out to the client does not make LegalMatch's referral incomplete. While a subscribing lawyer may choose to decline to take a case or reach out to a client, the lawyer still receives the potential client's information and may review the potential matter; the *referral* has thus already occurred even if the lawyer never speaks to the client. Although this communication occurs online, the situation presented by this case is thus not appreciably different than the more common, traditional scenario in which a potential client asks one attorney for assistance, the attorney instead directs the client to an attorney with expertise in that practice area, and the second attorney declines to respond. Clients in both scenarios would still have received a referral. Similarly, the act of referring is not negated by the fact that LegalMatch communicates to its subscribing lawyers the information provided by potential clients without communicating the client's identities.

Accordingly, when LegalMatch gathers potential clients' geographic and case-type information and sends those potential clients to attorneys who (a) match the location and (b) have been permitted to join LegalMatch within a relevant practice area, the act of referral is complete. Section 6155 requires no more for a service to fall within its ambit.

The trial court determined that LegalMatch does not operate for the direct or indirect purpose of referring potential clients to attorneys. It reached this conclusion without explanation (but presumably in reliance on its view that engaging in "referral activity" requires an entity to exercise legal judgment before directing a client to an attorney).

In light of our interpretation of the term "referral" and the evidence adduced at trial, we conclude as a matter of law that LegalMatch operates for the "direct or indirect purpose, in whole or in part, of referring potential clients to attorneys." (§ 6155, subd. (a)(1).) Indeed, LegalMatch states that it "connect[s] people in immediate need of legal services with the right attorneys," and admits that consumers' inquiries are

18

"automatically sent" to subscribing attorneys. LegalMatch's operations therefore fall within the scope of section 6155.[9]

G.      *Unclean Hands*

LegalMatch asserted below that Jackson's unclean hands should bar his argument that section 6155 prohibited enforcement of the subscription contract. In light of its determination that LegalMatch was not operating a referral service covered by section 6155, the trial court stated that LegalMatch's unclean hands argument "must fail"—by which the court seems to have meant that it did not need to decide the issue. Because the "doctrine of unclean hands is heavily fact-dependent" and generally involves a question of fact (*Cross-Talk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 639, 641), the parties and court should resolve this issue on remand.

**DISPOSITION**

We reverse and remand for the court to evaluate the issue of unclean hands in light of our interpretation of section 6155.

---

[9] In a footnote, LegalMatch asserts that broadly defining regulated referral activity would raise free speech concerns under the California and United States constitutions. LegalMatch cites no authority in support of this one-sentence contention, and we thus treat it as forfeited. (*Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817; *Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 815.) We note, however, that even a fully-briefed argument might well fail on the merits. LegalMatch engages in commercial speech, which has "limited" First Amendment protection, and which may be regulated if the regulation is narrowly drawn and directly supportive of a substantial state purpose, such as protecting consumers from unscrupulous lawyer solicitation activity. (*Florida Bar v. Went For It, Inc.* (1995) 515 U.S. 618, 623–624, 634–635 [upholding state regulation banning lawyers and lawyer referral services from targeted direct-mail solicitation of personal injury victims for 30 days after accidents]; see also *Leoni v. State Bar* (1985) 39 Cal.3d 609, 617 n.8, 628 [imposing attorney discipline based on letters sent to potential clients that violated, e.g., rule 2-101(A) of the Rules of Professional Conduct, which then prohibited false, deceptive, misleading, or coercive communications relating to attorneys' availability for professional employment].)

19

_____
BROWN, J.


WE CONCUR:


_____
STREETER, ACTING P. J.


_____
TUCHER, J.


*Jackson v. Legalmatch.com* (A152442)

Trial Court:   City & County of San Francisco Superior Court

Trial Judge:   Hon. Curtis Karnow

Counsel:

Lohr Ripamonti & Segarich, Alec L. Segarich, Jason S. Lohr, for Cross-complainant and Appellant.

Litigation Law Group, Gordon Fauth; Kenneth LaMance, for Cross-defendant and Respondent.